46 333<br>
54 706

46 333<br>
57 234<br>
57 236

GILKIE & ANSON COMPANY, APPELLEE, v. DAWSON TOWN & GAS COMPANY ET AL., APPELLANTS.

FILED NOVEMBER 8, 1895.   No. 6590.

1. Corporations: LIABILITY OF STOCKHOLDERS.   In all cases of claims against corporations and joint-stock associations the exact amount justly due shall be first ascertained, and after the corporate property shall have been exhausted the individual subscribers thereof shall be individually liable to the extent of their unpaid subscriptions, and the liability for the unpaid subscriptions shall follow the stock. (Constitution, sec. 4, art. 11, referring to "Miscellaneous Corporations.")

2. ——: CAPITAL AND SUBSCRIPTIONS: TRUST FUND.   The capital, including unpaid subscriptions for stock of a corporation, is a trust fund for the payment of its creditors.

3. ———: SUBSCRIPTIONS FOR STOCK PAYMENT. Subscriptions for stock of a corporation may be paid in money or in property such as is within the power of a corporation to acquire and hold, or in labor for the corporation in the proper furtherance of its purposes and business.

4. ———: ———: ———. Where payment of subscriptions for stock is made in property or labor, it must be of such value as to be the money's worth; if property, of the value of the amount of the par value of the stock; and if labor, it must be reasonably of the face value of the stock.

5. ———: ———: ———. When property is conveyed to a corporation in payment of subscriptions for stock, it may be at a valuation agreed upon between the parties to the transaction, provided the valuation is one made in good faith or in the fair exercise of judgment and discretion honestly directed.

6. ———: VALUE OF PROPERTY EXCHANGED FOR STOCK: FRAUD: LIABILITY OF STOCKHOLDERS: RIGHTS OF CREDITORS. Where the property conveyed in payment for stock is knowingly and advisedly overvalued, it is but a formal and illusory compliance with the requirements of the law and fair dealing in this regard and is not sufficient, and the transaction may be impeached by a creditor of the corporation as a fraud, and the liability of the subscriber for stock, to the amount of the difference between the fair and true value of the property at the time it was conveyed and the fictitious value at which it was received, be enforced against such subscriber as an unpaid portion of his subscription to the stock and appropriated, in a proper action, to the satisfaction of the debts of the corporation.

7. ———: ———: FRAUDULENT TRANSFER OF STOCK: RIGHTS OF CREDITORS: EVIDENCE: ESTOPPEL. The books of a corporation are its private books, as to third persons, and such persons are not chargeable with notice of what is contained therein, nor with the duty of examining them for the purpose of ascertaining the condition of the capital in respect to whether fully paid in or not and at what valuation, before granting credit to the corporation, to the extent that a failure to do so will bar the right in a proper action to impeach the transfer of stock to a party in consideration of the conveyance to the corporation of property, which may be shown in the books, and prove its fraudulent character.

8. ———: ———: ———: ———: PLEADING. The amended petition *held* to be sufficient in its statements of the fraudulent character of the transaction therein sought to be attacked.

Gilkie & Anson Co. v. Dawson Town & Gas Co.

APPEAL from the district court of Douglas county. Heard below before HOPEWELL, J.

The opinion contains a statement of the case.

*G. W. Ambrose,* for appellants:

Fraud will never be imputed when the circumstances and facts upon which it is predicated may consist with honesty and purity of purpose. (Bump, Fraudulent Conveyances [3d ed.], 603; *Clemens v. Brillhart,* 17 Neb., 337.)

Where subscriptions for stock are paid in property, a creditor of the corporation who alleges fraud in the transaction must not only prove that there was an overvaluation of the property, but must prove also that such overvaluation was intentional. (*Douglas v. Ireland,* 73 N. Y., 100; *Schenck v. Andrews,* 57 N. Y., 133; *Boynton v. Andrews,* 63 N. Y., 93; *Lake Superior Iron Co. v. Drexel,* 90 N. Y., 87; *Brant v. Ehlen,* 59 Md., 1; *New Haven Horse Nail Co. v. Linden Spring Co.,* 142 Mass., 349; *Coffin v. Ransdell,* 11 N. E. Rep. [Ind.], 20; *Phelan v. Hazard,* 5 Dill. [U. S. C. C.], 45; *Crawford v. Rohrer,* 59 Md., 599; *Young v. Erie Iron Co.,* 31 N. W. Rep. [Mich.], 814; *Coit v. North Carolina Gold Co.,* 14 Fed. Rep., 12.)

Where the capital subscribed is settled for by a transfer to the corporation of personal property belonging to the subscribers at an honest valuation fairly made and agreed upon between them, they cannot be held individually liable to creditors because the value of the property, estimated in the light of subsequent events, will not equal the amount at which it was received. (*Coit v. North Carolina Gold Co.,* 119 U. S., 343; *Peck v. Coalfield Coal Co.,* 11 Brad. [Ill.], 88; *Carr v. Le Fevre,* 27 Pa. St., 413; *Liebeke v. Knapp,* 79 Mo., 22.)

The books of the company were open to the creditor.

He could and should have examined them. The articles were of record providing that shares should be issued as fully paid up. These articles were posted in the office of the company. The books showed the true state of affairs—just how the property was bought and paid for. The creditor made no inquiry and is estopped by his negligence. (*Peck v. Coalfield Coal Co.*, 11 Brad. [Ill.], 88; *Buchanan v. Litchfield*, 102 U. S., 218.)

*H. W. Pennock, C. A. Fowler*, and *Cavanagh, Thomas & McGilton, contra:*

The capital stock of a corporation is a trust fund for the benefit of creditors, which may not be wasted or squandered by the corporation, and which may be sequestered in equity by creditors when the corporation has become insolvent. (*Fothergill's Case*, L. R., 8 Ch. App. [Eng.], 270; *Wood v. Dummer*, 3 Mason [U. S. C. C.], 308; *Sawyer v. Hoag*, 17 Wall. [U. S.], 610; *Osgood v. King*, 42 Ia., 478; *Upton v. Tribilcock*, 91 U. S., 47; *Sanger v. Upton*, 91 U. S., 60; *Crawford v. Rohrer*, 59 Md., 599; *Weatherbee v. Baker*, 35 N. J. Eq., 501; *Elyton Land Co. v. Birmingham Warehouse & Elevator Co.*, 92 Ala., 407.)

Subscriptions to capital stock may be regarded as debts due to the corporation always worth the par value of the stock. If the officers of the company have compromised with subscribers by any colorable transactions, so that the stock has not been fairly paid for, creditors may step in and enforce full payment therefor against all parties holding such stock with knowledge of the facts. (*Upton v. Tribilcock*, 91 U. S., 47; *Sanger v. Upton*, 91 U. S., 60; *Gogebic Investment Co. v. Iron Chief Mining Co.*, 47 N. W. Rep. [Wis.], 726.)

A gross and obvious overvaluation is sufficient of itself to establish fraud as against creditors, unless the transaction can be fully and fairly explained upon a reasonable business basis. (*Douglas v. Ireland*, 73 N. Y., 100; *Na-*

tional Tube Works Co. v. Gilfillan, 124 N. Y., 302; North-western Mutual Life Ins. Co. v. Cotton Exchange Real Estate Co., 46 Fed. Rep., 22; Boulton Carbon Co. v. Mills, 78 Ia., 460; Bailey v. Pittsburgh & Connellsville Coal & Coke Co., 69 Pa. St., 334.)

The following cases were also referred to in the argument of counsel for appellee: Thayer v. El Plomo Mining Co., 40 Ill. App., 345; Gogebic Investment Co. v. Iron Chief Mining Co., 78 Wis., 427; Carter v. Union Printing Co., 54 Ark., 576; Terry v. Little, 101 U. S., 216; Farmers Bank v. Gallaher, 43 Mo. App., 483; Shickle v. Watts, 94 Mo., 410; Jackson v. Traer, 64 Ia., 469; Scoville v. Thayer, 105 U. S., 143; Union Ins. Co. v. Frear Stone Mfg. Co., 97 Ill., 537; Alling v. Wensell, 133 Ill., 264.

HARRISON, J.

December 26, 1891, this action was instituted by the creditors of the Dawson Town & Gas Company, a corporation formed under the laws of this state, against the corporation and the appellants, stockholders therein, to recover the amounts of judgments in favor of such creditors. The original party plaintiff was the Gilkie & Anson Company, the Crane Company becoming a party plaintiff by intervention. In the original petition the organization and existence as a corporation, of the defendant and also the plaintiff company, was averred, the object and purpose for which the defendant company was organized, its place of business, and the sale to it by plaintiff of a quantity of lumber, and that judgment was obtained for the debt thus created, execution issued and returned no property found. The insolvency of the defendant company was also alleged, and it was further stated: "That the authorized capital stock of said defendant corporation is $300,000; that the said defendant refuses to allow the plaintiff to examine its books, and the plaintiff cannot learn and has no means of finding out the exact amount of stock actually issued, or the amount

of the unpaid portion of the subscriptions; but plaintiff alleges, upon information and belief, that defendants Norman A. Kuhn, Charles D. Woodworth, Arthur H. Cooley, and J. T. Hoile each own a large amount of said stock, the full par value of which has never been paid into said corporation, and that the amount remaining unpaid of the stock so owned and held by each of the said defendants is sufficient to pay the claim of the plaintiff in full. Plaintiff alleges further that the said corporation defendant was created in the month of September, 1889, and alleges, upon information and belief, that since its creation it has failed and neglected to give any annual notice, signed by its president and a majority of its board of directors, of the amount of all its existing debts in any newspaper printed in the county or any of the counties in which its business has been transacted, as is provided and required by the statutes of the state of Nebraska." These allegations, except in relation to the creation of the corporation, were denied in answer filed for the defendant company and the stockholders, and it was further averred that full payment of the par value of the stock owned by the stockholders, had been made. The Crane Company was allowed to intervene and become a party plaintiff. Its petition stated no new facts, but referred to, and made a part of it, the material allegations of plaintiff's amended petition. The plaintiff company was, on application, allowed to file an amended petition, in which it included other and further parties as stockholders and defendants, and after pleading substantially as in the original petition, the creation of the corporation, its purpose and powers, the indebtedness to plaintiff, the judgment, etc., the insolvency of the defendant company, and the failure to publish the annual notice required by law, further alleged: "That the authorized capital stock of said defendant corporation is $300,000; that said stock was issued to each of the defendants Cooley and Hoile to the amount and of the par

value of $120,000, and that as payment therefor defendants fraudulently turned into said corporation certain real estate at a false and fictitious valuation of $205,000 and nothing else whatever, and that said real estate was worth no more than $10,000, of all of which defendants Cooley, Kuhn, and Woodworth at the time had knowledge, and that there now remains unpaid on said stock the sum of $230,000; that defendant Cooley is now the owner of said stock issued to him of the par value of $53,500, and that there remains unpaid thereon, and said Cooley is individually liable to the creditors of said corporation by reason thereof, in the sum of $51,270.80; that defendant Charles D. Woodworth is now the owner and holder of said stock issued to said Cooley, by assignment from him, of the par value of $35,000, and that there remains unpaid thereon, and said Woodworth is individually liable to the creditors of said corporation by reason thereof, in the sum of $33,451.66; that defendant Thomas H. Platter is now the holder and owner of said stock issued to said Cooley, by assignment from him, of the par value of $4,000, and that there remains unpaid thereon, and said Platter is individually liable to the creditors of said corporation by reason thereof, in the sum of $3,833.33; that defendant Norman A. Kuhn is now the owner and holder of said stock issued to defendant Hoile, by assignment from him, of the par value of $35,000, and that there remains unpaid thereon, and said Kuhn is individually liable to the creditors of said corporation by reason thereof, in the sum of $33,541.66; that defendant Alexander G. Charlton is now the owner and holder of said stock issued to said Hoile, by assignment from him, of the par value of $12,500, and that there is unpaid thereon, and said defendant Charlton is individually liable to the creditors of said corporation by reason thereof, in the sum of $11,979.16; that defendant J. R. Pearson is now the owner of said stock issued to said Hoile, by assignment from him, of the par

value of $5,000, and that there remains unpaid thereon, and said Pearson is individually liable to the creditors of said corporation by reason thereof, in the sum of $4,785."

The answer to the amended petition and petition of intervenor put in issue all the material facts therein stated, except that of the formation of the corporation, and further pleaded as follows: "Defendants aver as true that all stock as owned by them, or either of them, was in good faith taken and paid for at the time, and they, nor either of them, are now or at any time were indebted to said corporation for any amount of said stock or shares thereof. The defendants further answering show to the court that neither said amended petition nor the petition of intervention of the Crane Company states facts sufficient to constitute a cause of action against either of said defendants."

The plaintiff filed a reply, which was a denial general as to some and special as to others of the allegations of the answer. In the portion of the amended petition which we have copied herein the following words appear, "of all of which defendants Cooley, Kuhn, and Woodworth at the time had knowledge," which were not in the petition at the time of trial or introduction of testimony. There was a demurrer *ore tenus*, on the ground that the petition did not state a cause of action, and plaintiff and intervenor asked leave to amend, which, at the time of the rendition of decree, was granted, the amendment to be by interlineation, and pursuant to this leave the words above quoted were inserted in the petition. The petition stated two causes of action against the stockholders, one based upon their ownership of shares of stock for which full value had not been paid, and a second upon a failure to publish an annual notice of the indebtedness of the corporation. Counsel agree in the statement that the second of these was waived and that no evidence was introduced to prove or sustain it; that it was not of the issues litigated, was not urged, or was withdrawn from the issues in the trial court, and is not

urged here and need not be further noticed.    The trial in
the district court was of the issues joined upon the first
cause of action, and in its decree the court set forth the
findings, which, to the extent we need notice them particu-
larly, were as follows :    "The court finds from the evidence
that the plaintiff, a corporation, on July 5, 1890, duly re-
covered judgment against the Dawson Town & Gas Com-
pany, a corporation, in the district court of Douglas
county, Nebraska, in the sum of $763.38, and costs taxed
at $15.68; and on September 3, 1890, the intervenor, the
Crane Company, a corporation, duly recovered judgment
against said defendant corporation in the county court of
Douglas county, Nebraska, in the sum of $904.50, and
costs taxed at $3.15; that the defendant the Dawson Town
& Gas Company is insolvent and without property where-
with an execution may be in any part satisfied; that the
authorized stock of the defendant corporation was $300,-
000, to be issued in shares of $100 each; that stock of the
defendant corporation was issued to each of two of its in-
corporators, A. H. Cooley and J. T. Hoile, defendants, of
the par value, and to the amount of $120,000; that as full
payment for said stock said incorporators turned into said
company certain real estate, subject to mortgages aggregat-
ing $25,000, the equity in which was at the time of the
value of $20,000, and that said real estate was accepted by
the directors of the defendant corporation in full payment
of said stock, and that said stock was issued as fully paid
and non-assessable; that of said stock so issued defendant
Arthur H. Cooley is now the owner of 575 shares; de-
fendant Norman A. Kuhn (as to the complaining creditors),
of 350 shares; defendant Charles C. Woodworth, of 350
shares; and defendant Alexander G. Charlton, of 125
shares.    The court further finds that the act of the direct-
ors in accepting said real estate in full payment of said
stock was a fraud in law as to the creditors of said corpo-
ration, and that said estate was a payment on said stock

only to the amount of the actual value of the interest of said incorporators therein, and that there remains unpaid on said $240,000 the sum of $220,000; that defendants Arthur H. Cooley, Norman A. Kuhn, and Charles D. Woodworth had knowledge at the time they acquired their said stock of the manner in which the pretended payment was not accepted by the defendant company in good faith, and that the defendants owning shares of said stock are each liable for the unpaid portion thereof in such ratio to the whole amount unpaid as the number of shares owned by each bears to the whole number of said shares; i. e., Arthur H. Cooley, in the sam of $52,708.33; Norman A. Kuhn, $32,083.33; Charles D. Woodworth, $32,083.33; and Alexander G. Charlton, $11,458.33."

The liability upon which this alleged cause of action was predicated, and which was and is relied upon, is provided for in the following section of the constitution of our state, being section 4 of article 11, referring to "Miscellaneous Corporations": "In all cases of claims against corporations and joint stock associations the exact amount justly due shall be first ascertained, and after the corporate property shall have been exhausted, the original subscribers thereof shall be individually liable to the extent of their unpaid subscription, and the liability for the unpaid subscription shall follow the stock." The plaintiffs claimed that the transactions which occurred at the inception of the defendant corporation, the issuance of stock and acceptance of the equity in certain land in payment for the stock, were of such a character as to constitute a fraud, and the transfer of the lands will only be considered a payment for the stock to the amount of their true values, and the stockholders be liable individually to creditors for any balance required to make the par or face value of the stock. The defendant company was organized for the following purposes, as shown by its articles of incorporation: "The business to be transacted by said corporation shall be the

buying of lands in the states of Iowa and Nebraska, platting into lots and selling the same, lending money on real estate and other securities, building houses, leasing and selling the same, erecting and furnishing buildings, machinery and all necessary appliances for the manufacture of brick, terra-cotta, tiling, and other products from clay, and the conducting of a general business of the manufacture and sale of brick, terra-cotta, tiling, and other products as aforesaid; acquiring by purchase and lease of lands upon which to sink wells, producing natural gas and oil, and acquiring by purchase, lease, or the exercise of the right of eminent domain, of lands for right of way for the laying of gas mains, laterals, and house connections; the erection of buildings and machinery for the manufacture, storage, and transmission both of artificial and natural gas and oils; the purchase, sale, and exchange of pipes, mains, fixtures, machinery, and material for the business of furnishing natural and artificial gas to municipalities and individuals; the mortgaging of the property of said association, procuring of loans; and, generally, the transaction of all business incident to the development and storage of oil and natural gas, and the manufacture of artificial gas and storage, transmission, sale, and delivery of such gases and oil to municipalities and individuals."

It appears from the testimony that Cooley, Hoile, Kuhn, and Woodworth organized the defendant company, signed the articles, and were directors and well acquainted with the details of its formation, the purchase of the lands and issuance of $240,000 in stock in payment for them. There were two tracts of land, one of 300 acres, known as the "Tolle Farm," and one of 320, known as the "York Farm." Coal had been discovered on the "Tolle Farm" and had been developed, or two shafts sunk on one forty-acre piece. The rights to all coal or all mineral existing under the surface of this forty acres had been conveyed to a Mr. Whiteman. Coal had been prospected for on the

other portions of this farm, but not developed or mined.
Cooley and Hoile had contracted for the purchase of the
"Tolle Farm" at some date prior to the formation of the
defendant corporation in such a manner that they had what
they termed an option on it, and after they had made ar-
rangements for the creation of the corporation and its prob-
able purchase of the land, they completed the deal and be-
came the owners of the farm, paying therefor $21,000.
The conveyance to them did not include the coal under
the forty acres in which shafts had been sunk.   The other
320 acres, or the "York Farm," belonged at the time
of its purchase by Cooley and Hoile to the Perry Nat-
ural Gas Company, in which Cooley and Hoile had each
a one-sixth interest.   H. B. Stout, T. R. Pearson, and C.
H. Wigton also each owned a one-sixth interest in the
Perry Gas Company, and agreed to sell their interests to
Cooley and Hoile for $5,000 each of stock of the Daw-
son Town & Gas Company, and the "York Farm"
of 320 acres was conveyed to Cooley and Hoile.   There
were on this farm some gas wells which were in operation
prior to and about the time of the sale to Cooley and Hoile.
They then gave two mortgages on the 620 acres of land,
one of $20,000 and one of $5,000, and conveyed it to the
defendant corporation, it assuming and agreeing to pay the
incumbrances, and Cooley and Hoile receiving as a fur-
ther consideration for the transfer of the land to the com-
pany $240,000 in stock, or $120,000 each.   Kuhn pur-
chased fifty shares, for which he paid cash, as did also C.
D. Woodworth, these being the only shares of stock sold
for which money was paid or received.   Cooley transferred
$35,000 worth of his $120,000 of stock to Woodworth and
a like amount to Bartlett.   Hoile transferred $35,000 in
stock to Kuhn, and on the date when the one hundred
shares which Kuhn and Woodworth had bought were is-
sued to them respectively there was issued to Bartlett,
Kuhn, and Woodworth, respectively, $35,000 each of the

stock which had belonged a part to Cooley and part to Hoile.   Neither Woodworth nor Kuhn nor Bartlett paid any cash or gave any definitive or fixed consideration for this $35,000 worth of stock.   Cooley, when testifying, stated in relation to the issue to Woodworth, in answer to a question by the court, that a part of the consideration for the issue of the $35,000 in stock to him was that he, Woodworth, would subscribe for fifty shares of stock.   Subsequently, during his testimony, he stated this was not the fact and that he did not think he had so testified.   All parties agreed that these shares were issued to Bartlett, Woodworth, and Kuhn for assisting in floating the institution, to aid in selling stock, in inducing parties to go to Dawson and invest in lots or property or build factories and to contribute money when needed in the business of the corporation. Kuhn stated that he advanced to the company $7,000 and . Woodworth claims that he contributed $5,400 to pay running expenses of the company, not as payment for or on stock, but advances which they expected to be repaid to them.   The defendant corporation was organized in September, 1889.   It continued its various operations for several months afterwards, when it ceased active business. Some of the parties testify for want of funds.   The $20,-000 mortgage was foreclosed and on February 28, 1891, sale of the property was made by the sheriff, the sum realized being $16,000.   The foregoing are some of the facts and circumstances attendant upon and entering into the formation of the defendant corporation.   There was considerable testimony on behalf of defendants which it was claimed tended to show the good faith of the members of the company in the transactions which occurred at or near the time of its formation, the purchase of the land and issuance of the stock in payment therefor; and by plaintiffs an attempt to show the want of good faith in the actions to which we have just alluded.   The value of the land at the time it was conveyed to the corporation was also made

the subject of testimony on behalf of either party to the case, but we do not deem it necessary to quote from or summarize it.

It is urged that the findings of the trial court are not sustained by the evidence, and especially as to the points in regard to the alleged overvaluation of the property conveyed to the corporation in payment for stock of the face value of $240,000, the knowledge which it was claimed the parties who were actors in the formation of the corporation had of the excessive valuation of the land at the time it was conveyed to the company and the stock issued, and their participation or aquiescence in the transaction. We have carefully read and considered all the testimony, and, without entering upon a lengthy discussion of or commenting upon it, will say that we are satisfied that it is sufficient to support the findings of the trial judge.

It is further contended by the able counsel for defendants that it is not proved that in accepting the land at the valuation they did in payment for the stock they were acting otherwise than in good faith with each other and with the public, and although it may be claimed, and probably truthfully, that subsequent developments disclosed that there was an error of judgment, yet fraud in law or in fact cannot be imputed, and that in a case similar to the one at bar, in order to establish a basis for a recovery, the law requires that more than proof of an overvaluation of property conveyed or services rendered in payment for stock of corporations be given; that it must be shown that the overvaluation was intentional and therefore fraudulent; that what the parties have constituted a payment will be treated as a payment until impeached for fraud, even where the rights of creditors are involved; that before parties gave the corporation credit they should have examined its books, the condition of its affairs, and how the stock was paid for, and to what extent, and not having done so they were at fault, and a number of au-

thorities are cited to sustain the propositions announced in this contention. In some jurisdictions it is provided by law that stock purchased of a corporation, such as the one from the creation of which this controversy arose, must be paid for in money. In others that it may be paid for in money or in property or labor which the corporation is entitled to acquire, or can use in the furtherance or forwarding the purposes for which it was created. In some the provisions further require that the property or labor be the "money's worth" at a fair and reasonable value, and others that property or labor be received at its worth in money, and in good faith. In California there is a statute under which mining stock may be purchased at less than its par value without making the stockholder liable for such par value, and custom seems to have sanctioned a similar relaxation of the rule that par value must be paid. (*In re South Mountain Consolidated Mining Co.*, 7 Sawy. [U. S.], 32; *Ross v. Silver & Copper Island Mining Co.*, 26 Am. Law. Reg. [Minn.], 158.) But, as is said in a note to the last mentioned case, on page 164, "Concluding with reference to mines, it may be laid down as a general proposition, that, in the absence of a custom or statute, shareholders in a mining corporation are liable for the par value of shares subscribed by them, and if a custom to the contrary is relied upon to exonerate a shareholder from liability, such custom must be proved; it will not be judicially noticed." (See cases cited.) In this state there were no specific requirements or restrictions in relation to the manner of payment for the stock purchased, and no doubt the land, being such as it was within the province of the company to hold and appropriate for use in its business, could be received in payment for stock. There was no statutory requirement that payment should be in money or the money's worth; but without such an enactment, we think there is a rule of honesty and fair dealing, which should and will be recognized by the courts, which required it. It is the settled doc-

trine in this country that "the capital stock of a corporation
is a trust fund, to be preserved for the benefit of corporate
creditors," and this includes the unpaid subscriptions to
such stock.   It follows that the funds cannot be wasted or
dissipated and that an acceptance of payment for stock sub-
scriptions which is merely simulated, or any other arrange-
ment or scheme by which something is allowed as a pay-
ment of subscriptions for stock, which lacks the element of
good faith, will not be sufficient to and cannot impair or
work the defeat of the trust. (*Scovill v. Thayer*, 105 U. S.,
143; *Osgood v. King*, 42 Ia., 478; *Wetherbee v. Baker*, 35
N. J. Eq., 501.)   It must be true that where a number of
persons have organized themselves as a body corporate and
enter the business arena as such and invite and entertain
dealings on the faith and credit of a fund which, increased
by gains or decreased by losses, will alone be available for
the liquidation or payment of debts, that they will be held
to fairness and good faith in fulfilling the promise they
made to contribute to the fund which they hold out to the
business world as the basis for credit.   It is upon the faith
of the amount of the capital stock, either fully paid in and
existing in the form of assets of the corporation, or to be
paid in, that the creditor has dealt with and allowed the
corporation to incur the liability, or has extended to it the
credit, and it seems but just and right to require that pay-
ment for stock in other than money be required to be made
in the money's worth in good faith and honesty of purpose,
and when the circumstances and facts of a sale and purchase
of stock disclose that there has been knowingly less than
these, that it shall not be upheld as against creditors, but
the parties be compelled to right what is wrong, to pay and
make good that which, through any device or scheme, has
been withheld.   Upon the question of the liability of
stockholders to creditors on stock which had been issued
for property received at an overvaluation the decisions of
the courts are apparently irreconcilable. (For a review of

them see *Elyton Land Co. v. Birmingham Warehouse & Elevator Co.*, 9 So. Rep. [Ala.], 129.) We are satisfied that the weight of authority in this country is in favor of the doctrine that where any agreement is made whereby stock is knowingly and advisedly issued as paid in full, though but partially paid for, it may be set aside by creditors and the enforcement of payment in full of the subscription for the stock obtained for the satisfaction of the debts of the corporation. This is a result of the doctrine that the subscriptions for stock of a corporation are a trust fund for the payment of its debts, which is an American doctrine, and which does not prevail in England. (Taylor, Private Corporations, sec. 658, note 1.)

It may be conceded that when the power exists to accept property in payment for stock the corporation and subscriber may agree upon the value of property to be received in payment for stock in such manner as to be binding upon creditors, if there is no considerable advised and deliberate excessive overvaluations of the property, and that the stockholders will not be liable where the valuation was in good faith, although the property may subsequently prove to be of a less value than that placed upon it, or if there was nothing more than an honest mistake of judgment, but "a gross and obvious overvaluation of property, would be strong evidence of fraud," in an action by a creditor to enforce a personal liability. (*Coit v. Gold Amalgamating Co.*, 119 U. S., 343, 7 Sup. Ct. Rep., 231.) Where property is conveyed to a corporation as payment of a subscription for stock, it is insufficient to satisfy the liability of subscribers to the creditors of the corporation, if there has been a fraudulent overvaluation of the property,—an overvaluation knowingly and advisedly made. The property proffered and received as payment must be of such a value as to make it of the money's worth stated in the subscription, at a valuation made in good faith in an exercise of judgment honestly and fairly directed. (*Williams v. Evans,*

87 Ala., 725, 6 So. Rep., 702.) It will be sufficient to im-
peach the transaction to prove that the stock issued and
delivered to the subscriber exceeded in amount the value of
the property conveyed to the corporation in payment for
the stock; that the parties to the transaction of sale and
purchase of the stock knowingly and advisedly placed such
overvaluation upon it that there was paid in stock for it an
amount the par value of which was known to be more than
the actual value of the property. (*National Tube Works Co.
v. Gilfillan*, 124 N. Y., 302; *Wetherbee v. Baker*, 35 N. J.
Eq., 501; *Osgood v. King*, 42 Ia., 478; *Boulton Carbon
Co. v. Mills*, 78 Ia., 460; *Jackson v. Traer*, 64 Ia., 469;
*Bailey v. Pittsburg & Connellsville Gas, Coal & Coke Co.*,
69 Pa. St., 334; *Thayer v. El Plomo Mining Co.*, 40 Ill.
App., 345; *Elyton Land Co. v. Birmingham Warehouse &
Elevator Co.*, 92 Ala., 407; *Leucke v. Tredway*, 45 Mo.
App., 507; *Crawford v. Rohrer*, 59 Md., 599; *Northwest-
ern Mutual Life Ins. Co. v. Cotton Exchange Real Estate
Co.*, 46 Fed. Rep., 22; *Scovill v. Thayer*, 105 U. S., 143.)
The trial court established by its findings that the facts of
the present case brought it within the foregoing rules, and
there was sufficient testimony to support the findings.

It is urged that these parties—creditors,—before they gave
credit to the corporation, should have examined the books
of the company and ascertained whether appellants had
paid in full for the stock or in what manner the payment
had been made, and, having failed to do so, cannot now
complain or be heard, and cases are cited in support of this
proposition. In Cook, Stock, Stockholders & Corporation
Law, section 199, it is said: "The public, in dealing with
a corporation, has the right to assume that its actual capi-
tal in money or money's worth is equal to the capital stock
which it purports to have, unless it has been impaired by
business losses." We think the true rule to be that
"Entries in the books of a corporation are, as a general
rule, competent evidence of the proceedings of the corpora-

tion and of the acts and votes of its officers transacted at official meetings; but such entries are not notice to third persons of the acts or resolutions entered upon its minutes. As to third persons, the books of a corporation are private books, and such persons are not chargeable with knowledge of matters therein recorded, any more than a third person would be chargeable with knowledge of entries made against him in the books of a private person. (1 Greenleaf, Evidence, sec. 493; 1 Wharton, Evidence, sec. 662; *Haynes v. Brown*, 36 N. H., 545; *Marriage v. Lawrence*, 3 B. & Ald., 142;" *Wetherbee v. Baker, supra.*)

It is claimed that upon the abandonment of the alleged statutory default in respect to publication of notice the petition did not state a cause of action; that there was no sufficient allegation of fraud. We think the petition, as amended by leave of the court, sufficiently stated and charged fraud (*Northwestern Mutual Life Ins. Co. v. Cotton Exchange Real Estate Co.*, 46 Fed. Rep., 22); and the amendment and its allowance were entirely proper under the provisions of the Code.

Complaint is also made of the ruling of the trial court in sustaining an objection to an interrogatory propounded to one of appellants during his examination as a witness. No statement or offer of proof was made, and we cannot hold that the objection was wrongfully sustained. (*McMillan v. Malloy*, 10 Neb., 235; *Stanton County v. Canfield*, 10 Neb., 388; *Sieber v. Weiden*, 17 Neb., 584.) The judgment of the district court is

AFFIRMED.

RAGAN, C., dissenting.

This is a suit by some creditors of an insolvent private corporation against its stockholders. The creditors seek to recover their debts of the stockholders on the ground that the latter are indebted to the corporation on their stock subscription. This corporation was authorized by its charter

to engage in the business of buying and selling lands in
the states of Nebraska and Iowa; to plat and lay out real
estate into lots, blocks, streets, and alleys for the purposes
of cities, villages, and towns; to manufacture brick, terra-
cotta, tiling, and other articles that could be made from fire
clay; to pipe gas and to mine coal, etc. The authorized
capital stock of the corporation was $300,000, of which the
appellants Hoile and Cooley took $240,000, and paid for
the same by deeding to the corporation 620 acres of land.
The petition of the appellees filed in the court below
charged that the appellants in payment for the stock sub-
scribed by them fraudulently turned into said corporation
certain real estate at a false and fictitious valuation, to their
knowledge. The district court found that the act of the
directors in accepting said real estate in full payment of
said stock was a fraud in law as to the creditors of said
corporation. The court also found that the value of the
real estate transferred to the corporation by Cooley and
Hoile was $20,000.

The decision of this court treats this conclusion of the
district court as a finding that the transaction by which
Cooley and Hoile transfered their real estate to the corpo-
ration in payment of their stock subscription was a fraud
in fact. I do not think the district court found or meant
to find that the transaction was a fraud in fact, but, assum-
ing that it did, let us inquire on what evidence this finding
was based. Briefly it is that Cooley and Hoile owned 620
acres of land and that they conveyed this land to the cor-
poration in payment and satisfaction of their contract of
subscription with it to take $240,000 of its capital stock;
that this land at that time was worth only $20,000, and
that the debts of the appellees were contracted long after
this transaction. If this evidence stood alone—stood un-
explained—it might support the finding, but it does not
stand alone and unexplained. I quote the evidence given
by appellee's own witness.

Q. Do you know whether at that time there had been any prospecting for gas; that is, at the time the conveyance of the land was made to the corporation?

A. Yes, sir; there had been considerable prospecting for gas and they might have incidentally prospected for coal at that time.

Q. Had gas been found?

A. Yes, sir.

Q. How long had gas been found on this farm at this time? In what quantities; state what you can as to the fact.

A. My recollection as to the time of first striking gas there is that it was perhaps fifteen to eighteen months after gas was first struck there on this farm until the transfer to the Dawson Town & Gas Company. As to the quantity I would not feel qualified to state more than just what I could naturally see, not being a gas expert.

Q. Do you know how many of the gas wells were sunk prior to this time?

A. As to the number I could not definitely say, more than I know that there was one we called the "original well," and I think that there were one or two others, but I am not sure whether they were sunk. If they were it was just previous to the time of the Dawson Town & Gas Company buying this.

Q. What can you say as to the flow of the gas from the well or the continuity of it and the amount of it?

A. * * * I have been there a good many times and lived right there, and of course everybody had a natural curiosity to see them, and I have been there a time or two when there were excursions. I know when they were turned on and lighted up flames would flash up there twenty-five or thirty feet and higher.

Q. Was any use or attempted use ever made of this gas after this?

A. After they acquired it?

27

Q. After they acquired it.

A. Yes, sir.

Q. You may state what use it was put to.

A. These wells are situate about a mile from the town of Dawson  *  *  *  and probably a mile and a quarter from what is known as the "brick plant," and the company, after acquiring these wells, laid pipes from the wells to the brick plant  *  *  *  up to the edge of the town or into where the town was planned,  *  *  *  and this gas was piped into our store, and we burned it one winter; I do not know but two winters.

Q. Did they ever use it at the brick yard?

A. They used it there and they piped it into the furnace under the engine, and they also piped it into the brick-kilns.

Q. When were the developments of coal made there?

A. The first developments?

Q. Yes, sir.

A. The fall of 1886 and the winter of 1886 and 1887.

Q. Do you know anything about in what quantities coal was taken from this land?

A. At what time?

Q. Well, after it was developed, from 1887 on.

A. Up to what time?

Q. Well, any time.

A. Well, they sunk a shaft in the fall of 1886 and they took out coal that winter and they run the most of that winter there; they run from eight to fifteen miners and they would take out, oh, probably twenty tons a day.  *  *  *

Q. How long did this continue?

A. Well, this continued until the Dawson Coal Company bought.  *  *  *

Q. At the time this property was transferred to the Dawson Town & Gas Company was any of this land platted into a town site?

A. There had been a survey made.  *  *  *

Q. Well, take it in the fall of 1889.  How much of a town was there then?

A. There were about three hundred inhabitants.

Q. Do you know how many of these gas wells there were there?

A. At the present time?

Q. Well.

A. Well, they were all there that was.  They were all either sunk in 1889 or previous to that.  I think there are five wells, four of these that they have houses over and use, and the fifth one is what we call a gurgle and that is filled with water and they have trouble with it, but there is more or less gas in it.  *  *  *  I think there is only four that is piped that I spoke of.

The lands conveyed to the corporation by Cooley and Hoile are contiguous, all situate in the state of Iowa, and one tract of about 300 acres had been purchased by Cooley from the Tolle estate.  Tolle in his lifetime had leased to certain parties the right to mine coal on forty acres of the lands conveyed to Cooley, the lessees paying Tolle a royalty of ten cents per ton.  Now let us hear once more the appellee's witness:

Q. Now, there has been some other leases spoken of.  Under what particular portion of the lands were those leases?

A. Those were under the lands acquired by Mr. Cooley.

Q. In the transfer to Cooley, who acquired the right to those leases, did he?

A. Yes.  *  *  *

Q. So that whatever would accrue on those leases would belong to Mr. Cooley instead of the Tolle heirs?

A. Yes, on those leases, that is right.  *  *  *  Mr. Tolle died in February, 1888.  In the spring of 1887 *  *  *  Mr. Tolle requested me to make a measurement, to take the measurement on coal and estimate how much royalty he would receive at ten cents per ton on the coal.

I made the measurements in the first bank or clay shaft that was sunk. * * * I made those measurements, and on the figures that Mr. Tolle gave me three cubic feet per ton of solid coal, and if the veins were the same it would net him about $400 per acre if the veins were the same on the other forties as they were on this forty where I made the measurements. * * *

Q. What was the thickness of the vein where you made the measurement?

A. The one vein was three feet ten inches, I believe. These veins vary, however, in different parts of the mine, and they would run from two feet and one-half to four feet and one-half.

Q. Is this village of Dawson situate on a part of this land?

A. Yes; * * * about a mile and a quarter from the gas well. * * *

Q. It is the coal land?

A. Yes, sir.

Q. Has coal been mined there continuously from that time on?

A. No, sir; coal has not been mined continuously, that is, if you mean by that taken out all the time, because there was a time for nearly a year there was no coal taken out.

Q. The mines were not worked?

A. No, sir.

Q. When was that?

A. That was previous to this last fall. * * *

Q. When was it first discovered on the York farm; part of the land conveyed by Cooley?

A. It must have been in 1888.

Q. Prior to the development and discovery of gas and the development of coal there, how much of a town was Dawson?

A. Well, in January, 1887, there wasn't only four or five houses in Dawson. * * *

Q. How many houses were there in January, 1888?

A. Well, I should say, just estimating from my recollection, about fifty.

Q. After the purchase of this land   *   *   *   was there any town platted known as the town of Dawson, by the Dawson Town & Gas Company?

A. Yes, sir.

Q. How many acres?

A. One hundred and sixty.

Q. Did you sell any of these lots?

A. A few; yes.

Q. At what price?

A. They varied in price.

Q. What did the business lots sell for?

A. From $125 to $266.

Q. How many miners worked there?

A. All the way from one hundred and fifty down at different times.

Q. How large a brick plant was started there after the gas was used?

A. The main part of the building was about sixty by sixty-five or seventy-five and the drying room was about fifty by probably one hundred and fifty.

Q. Do you know anything about the fire clay there under that ground?

A. I know there is fire clay there.

Q. To what extent?

A. I do not know.

Q. Did you ever make an examination?

A. No, sir; no personal examination.   I have been in the mines where fire clay was and asked miners about it.

Q. Out of what was brick manufactured?

A. Brick was manufactured out of shale and fire clay.

Q. Where was that latter to be obtained?

A. Out of the coal mines, and I think some little surface clay was used, but not very much.

Q. And that was all understood and known to exist there at the time of this sale by the Tolle heirs to Cooley?

A. Yes, sir.

The evidence quoted above stands absolutely uncontradicted, and is the evidence introduced by the appellee itself. This evidence does not show that the appellants intentionally overvalued the lands which they conveyed to the corporation in payment of their stock subscription. Granted that subsequent events have proved that the appellants erred in their judgment as to the valuation put on their lands, will the evidence that the appellants erred in their judgment support a finding of fraud? I think that this evidence shows that at the time these lands were deeded to the corporation for its stock it was honestly believed and reasonably believed by the appellants that they were coal, gas, and fire clay lands. Shafts had been sunk, coal had been mined on part of the lands, on other parts of the lands wells had been drilled and inflammable gas had been found, and the existence of these facts led to the organization of this corporation. The evidence further shows what appellants did after they became stockholders of this corporation, and this is important here in determining with what intention they made the transfer and took the stock; and the evidence shows that these appellants expended thousands of dollars of their money in efforts to develop these lands believed to be coal and gas lands, and had these proved to be what they appeared, if their development had disclosed valuable coal and oil deposits, who can estimate their value? Yet the transaction by which the corporation became possessed of these lands and the intent with which they were conveyed by the appellants would have been the same transaction and the same intent. A transaction cannot be said to be in good faith simply because successful, nor can a fraudulent intent be inferred because the transaction proved unsuccessful. Fraud will never be imputed when the circumstances and facts upon

which it is predicated may consist with honesty and purity of purpose. (*Clemens v. Brillhart*, 17 Neb., 335.) Is it not clear that this evidence is entirely consistent with the theory of honesty of purpose on the part of these appellants? Overvaluation of property will not of itself support a finding that the transaction was fraudulent, but the proof must show that such overvaluation was made intentionally and with a sinister motive. (*Schenck v. Andrews*, 57 N. Y., 133; *Boynton v. Andrews*, 63 N. Y., 93; *Lake Superior Iron Co. v. Drexel*, 90 N. Y., 87.) An overvaluation of property affords no ground of complaint to creditors of the corporation, provided such payment is made and accepted in good faith. (*Young v. Erie Iron Co.*, 65 Mich., 111.) While the contract stands unimpeached as fraudulent, the courts, even where the rights of creditors are involved, will treat that as a payment which the parties have agreed should be a payment (*Phelan v. Hazard*, 5 Dill. [U. S.], 45); and the fraud must be an actual fraud in the sense of a dishonest purpose, not a theoretical fraud (*Bank of Fort Madison v. Alden*, 129 U. S., 372). If these appellants have not paid in full their stock subscription, they are indebted to the corporation; but the appellee has no greater rights against the appellants than the corporation has; and how can it be said under this evidence that this corporation could impeach this transaction between it and Cooley and Hoile for fraud? If the corporation cannot impeach the contract, the creditors cannot do it. There is no evidence in this record that Cooley and Hoile, or either of them, in anything that they did in and by which they became stockholders of this corporation, were actuated by other than the purest motives. In *Coit v. Gold Amalgamating Co.*, 119 U. S., 344, the capital stock of the corporation was fixed at $100,000. Previous to the organization of the corporation the incorporators had been engaged in mining operations, and when the corporation was organized they turned in their mining property to

the corporation in payment of the full amount of the capital stock taken by them. The corporation became insolvent, and a creditor having obtained a judgment against it had execution issued, and it being returned no property found, he sued the stockholders to recover his debt, the ground of his action being that the property turned in by the stockholders to the corporation in payment of the stock subscribed was turned in at a fictitious valuation. The evidence disclosed that the property, when turned into the corporation, was of small value as compared to the amount of stock given for it, but that the stockholders, the nature of the property considered, had good reason to believe that it was of as great value as that put upon it by them and that the entire transaction was in good faith and not entered into for the purpose of putting the stock on the market, selling it, and keeping the proceeds and thus victimizing the public, but with a view on the part of the stockholders to develop the mines supposed to be on the property. The argument was that the transaction should be held fraudulent solely on the overvaluation of the property transferred to the corporation. The court said: "If it were proved that actual fraud was committed in the payment of the stock, and that the complainant had given credit to the company from a belief that its stock was fully paid, there would undoubtedly be substantial ground for the relief asked. But where    *    *    *    the shareholders honestly and in good faith put in property instead of money in payment of their subscription, third parties have no ground of complaint.    *    *    *    Where full paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account." To the same effect see *Peck v. Coalfield Coal Co.*, 11 Ill. App., 88; *Coalfield Coal Co. v. Peck*, 98 Ill., 139. They believed, and the evidence shows that they believed, and they had good reason to believe, and the evidence shows that they had such reason to

believe, that these properties were worth at the time they transferred them to this corporation four or five hundred dollars an acre. They proved their faith by what they did. They paid thousands of dollars for these lands and they spent thousands of dollars in their efforts to develop them after they became the property of the corporation. The evidence does not show, it does not tend to show, that they organized this corporation for the purpose of victimizing the public; they did not organize it for the purpose of putting this stock upon the market and selling it and pocketing the proceeds. The finding of a district court is entitled to serious consideration and great weight, but if the learned district court found in this action that the act of the appellants in paying for their stock in the land conveyed to the corporation was fraudulent, the finding has no evidence upon which to rest. The effect of this finding is to stamp the intention with which an act is done fraudulent or not as it may finally turn out that the party in doing the act did or did not err in his judgment; and where the act is a part of a commercial venture, whether or not it is fraudulent is made to depend upon the success or failure of such venture. To this I cannot agree.